**VERSYSS INCORPORATED,
Plaintiff, Appellant,**

v.

**COOPERS AND LYBRAND, ETC.,
et al., Defendants, Appellees.**

No. 92–1212.

United States Court of Appeals,
First Circuit.

Heard July 31, 1992.
Decided Dec. 30, 1992.

Patrick J. Sharkey, Henry A. Sullivan, John F. Sylvia, and Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., Boston, MA, were on brief, for plaintiff, appellant.

Steven W. Phillips, Christian M. Hoffman, Peter M. Casey and Foley, Hoag & Eliot, Boston, MA, were on brief, for defendants, appellees.

Before TORRUELLA, CYR and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

This case presents a common problem in statutory interpretation. Congress drafted a law that clearly embraces some transactions, clearly excludes others, and is now brought to bear on a transaction that Congress probably did not consider. We are left to make a judgment based on clues garnered from statutory language, legislative history, purpose and policy. In our view, the transaction at issue does not fit comfortably within the statutory language, and no clear policy or precedent encourages courts to extend that language beyond its normal bounds.

## I.

On May 17, 1985, Continental Telecom, Inc. ("Contel") entered into a merger agreement with Northern Data Systems, Inc. ("NDS"). The agreement provided that NDS would be merged into a newly created subsidiary of Contel and, in exchange, NDS stockholders would receive Contel stock. Both Contel and its merger subsidiary were Delaware corporations; NDS was a Massachusetts corporation. At the time of the merger agreement, NDS stock was publicly traded. Previously, a registration statement under the Securities Act of 1933 had been filed with the Securities and Exchange Commission in connection with an August 1984 public offering of NDS stock. See sections 5–16, 15 U.S.C. §§ 77e–77p.

The merger was approved by NDS stockholders, and NDS was merged into the Contel subsidiary on July 16, 1985. In accordance with the merger agreement, Contel's subsidiary as the surviving corporation acquired effective ownership of the assets, and responsibility for the debts, of the former NDS. The merger agreement provided that on the date of the merger, the "separate corporate existence of NDS shall terminate." Thereafter, in accordance with the merger agreement, the former NDS stockholders sent in their now defunct NDS stock certificates to Contel's exchange agent and received their Contel stock certificates.

Subsequent to the merger, Contel concluded that the NDS registration statement had contained materially misleading financial information, including information certified by the accounting firm of Coopers & Lybrand. Although the registration statement had been issued before the merger, section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, imposes (subject to certain limitations) continuing liability for misstatements or material omissions in registration statements; after the registration statement becomes effective, a federal damage action may be brought, by "any person acquiring such security," against any of a list of specific responsible persons, including the certifying accounting firm. Section 11(a), 15 U.S.C. § 77k(a). Accordingly, the present suit, now conducted by Versyss Incorporated as Contel's assignee, was brought against the accounting firm of Coopers & Lybrand.

In the district court, Coopers & Lybrand moved for summary judgment on the ground that Contel did not qualify as a section 11 plaintiff because it had not "acquired [NDS] securit[ies]." Patently, Contel "acquired" *something* in exchange for

the many Contel shares it issued in the merger, so the focus of the dispute is upon the term "security." Pointing to the transfer of the NDS certificates, Versyss claimed that NDS securities were acquired by Contel through the merger. The district court, adopting Cooper & Lybrand's view of the matter, held that the NDS stock certificates were an empty shell not qualifying as a "security" and that the essence of what Contel received was the assets and liabilities of the former NDS. The district court then granted summary judgment for Coopers & Lybrand on the section 11 claim, dismissing pendant state claims without prejudice. This appeal followed.

## II.

Statutory construction begins with statutory language. The language in this case is straightforward: section 11 of the Securities Act of 1933, so far as pertinent here, creates a federal cause of action in favor of a purchaser "acquiring a security" after a false or misleading registration statement for that security has gone into effect unless the defendant makes out a statutory defense comprising, in general terms, reasonable inquiry and good faith belief. Sections 11(a)(4), (b), 15 U.S.C. §§ 77k(a)(4), (b).

The term "security" is defined in both the Securities Act of 1933 and Securities Exchange Act of 1934, provisions which despite differences in language are construed alike. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 n. 1, 105 S.Ct. 2297, 2301 n. 1, 85 L.Ed.2d 692 (1985). Nothing in the language of the definitions precisely resolves the present issue except so far as the variety and breadth of the definitions encourage a broad construction.[1] But terms, even broadly construed, have outer limits, and those limits are strained badly by describing what Contel acquired through the merger as a "security."

On the date of the merger, and before any NDS stock certificates were to be transferred to Contel's exchange agent, NDS ceased to exist as a corporation. This is ordinary merger-law jurisprudence (*Frandsen v. Jensen–Sundquist Agency, Inc.*, 802 F.2d 941, 944 (7th Cir.1986) ("in a merger the shares of the acquired firm are not bought, they are extinguished")) and accords with the Contel–NDS agreement already quoted. Delaware's merger statute follows this pattern, providing that in a merger "the separate existence ... of all such constituent corporations except the one into which the other or others ... have been merged ... shall cease.... [and] all property ... shall be vested in the corporation surviving...." Del.Code Ann. tit. 8, § 259(a). *Accord,* Mass.Gen.Laws Ann. ch. 156B, §§ 80(a)(1), (5). Under the same statutes and the merger agreement, upon the merger the assets and liabilities of NDS became those of the surviving Contel subsidiary.

It follows that, when the merger became effective, NDS stock underwent a considerable transformation. At that point, the NDS stock certificates ceased to represent an investment interest in the separate assets of NDS (since it no longer existed), ceased to reflect voting rights in the management of NDS (since NDS ceased to have a management), and ceased to comprise a claim to dividends declared from NDS earnings (since no such dividends could be issued). In sum, for the NDS stock the essential characteristics of securities ceased to pertain. "[A]t the moment a stock for stock merger is effective, the stock in a constituent corporation (other than the surviving corporation) ceases to exist legally." *Shields v. Shields*, 498 A.2d

---

**1.** The 1933 Act definition, section 2(1), 15 U.S.C. § 77b(1), provides:

"The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

161, 168 (Del.Ch.), *appeal refused,* 497 A.2d 791 (Del.1985).

If this view is taken, then—when the former NDS stockholders turned in their NDS certificates *after* the merger—what Contel received was not "securities." At worst, the certificates were wall-paper; at best, they represented evidence that the parties who surrendered the certificates were prior owners of NDS stock, entitled by virtue of the merger agreement to be paid the Contel stock promised as consideration. Nor does Contel's position improve if one views the situation at the time after the merger agreement was signed but *before* the merger was consummated. It may be that for some purposes a contract to acquire securities can be treated as an acquisition. *Cf.* Sections 3(a)(13)–(14) of the 1934 Act, 15 U.S.C. §§ 78c(a)(13)–(14). But, as the trial judge pointed out, the merger agreement in this case between Contel and NDS was not a step on the road to Contel's acquiring of NDS securities but rather was an agreement to merge NDS out of existence.

There is a second piece of evidence, culled from the statutory language, that hinders Versyss' claim. Section 11 provides a damage formula for the cause of action it creates. Simplifying somewhat, Section 11(e) provides that the recovery is to be the difference between the (presumptively higher) price paid for the security when acquired by the plaintiff-buyer and either of three (presumptively lower) numbers: "(1) the value thereof [of the security] as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment...." 15 U.S.C. § 77k(e).[2]

This language assumes a buyer of securities who pays a price for and receives securities. Then, finding that the securities are worth less than the price paid, the buyer brings suit either for the loss of value or, if the buyer sells before suit or before judgment, for the loss suffered on account of the reduced sale price received by the buyer on resale. In sum, the continuation of the acquired securities in the hands of the plaintiff-buyer is a premise of the damage calculation. Yet in this case the NDS securities ceased to exist at the time of merger because the corporation ceased to exist. It would be fantasy to speak of the non-existent NDS securities as suffering a post-merger decline in value or being resold for less than the purchase price.[3]

Doubtless some formula could be jury-rigged to replicate the substance of section 11(e), were the merger to be treated as an acquisition of NDS securities by Contel. After all, if Contel acquired all of the NDS securities in a tender offer and then merged the company into its subsidiary, securities would have been "acquired" and an arguable claim would exist under section 11. But the statutory damage provision does limn the transactions toward which Congress directed section 11; and, as we have just seen, the extinction of NDS securities incident to the merger conflicts with section 11's premise of continuity. Viewing the case from the standpoint of damages may itself underscore the nature of Contel's real complaint: that effective upon the merger it acquired *a package of assets and liabilities* formerly pertaining to NDS that was worth less than Contel had been led to believe.

### III.

Words normally have some elastic in their makeup. Courts in other cases have stretched language further than Versyss asks us to do in this case. If legislative history or purpose encouraged that result, the question here might be a close one. The difficulty is that an inquiry into history

**2.** Subsection (e) provides a rule for choosing between alternatives (2) and (3) if the security has been disposed of after suit but before judgment, and it has several further limitations and provisos dealing with special circumstances. None of these provisions alters the basic structure of the damage formula.

**3.** The section 11 damage remedy was added by amendment in 1934, 48 Stat. 908, but the original section 11 remedy—rescission of the sale—also assumes continuation of the securities.

and purpose, if instructive at all, favors the more literal reading of the statute adopted by the district court.

The background of the 1933 Act is familiar history. During the stock market boom that preceded the Great Depression, a wave of speculation drove up the largely unregulated market in securities. When the market collapsed in 1929, "[f]ully half ... of the securities floated during this period ... proved to be worthless. These cold figures spell[ed] tragedy in the lives of thousands of individuals who invested their life savings, accumulated after years of effort, in these worthless securities." H.R.Rep. No. 85, 73rd Cong., 1st Sess. 2 (1933). The most notorious example was Samuel Insull's sale of several million shares of utility stock to the public. The stock, sold to family members and friends of Insull at $12 or less, opened at $30 in the market and climbed to $149 a share, before it collapsed—to the detriment of a million stock and bondholders. Joel Seligman, *The Transformation of Wall Street* 21–23 (1982).

One of the "foremost" causes of such losses was, in the view of Congress, "the failure to furnish essential information to prospective investors when they were invited to buy securities." I Louis Loss & Joel Seligman, *Securities Regulation* 25 (3d ed. 1989). The broad purpose of the 1933 Act was to require full disclosure to investors, and section 11 was "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & Maclean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983). Contemporaneous writings confirm that the main target of section 11 was the sale of registered securities to the public. See 77 Cong.Rec. 2918 (1933) (Rep. Rayburn); Douglas & Bates, *The Federal Securities Act of 1933,* 43 Yale L.J. 171, 174–77 (1933).

Needless to say, there is little resemblance between this scene of ill-informed small investors buying investment securities on original issue or later through the market and the triangular "forward merger" by which Contel acquired NDS, doubtless after careful study of information that went far beyond the registration statement issued some years before incident to a public NDS offering. This mismatch ought not deprive Contel of a section 11 remedy in any case where section 11's "acquiring such security" language fits the transaction (for example, a tender offer acquisition by Contel of the NDS shares). The mismatch does, however, create doubt that stretching the language to fit Contel's circumstances can be justified as serving Congress' purpose.

As the Supreme Court has reminded us, the federal securities laws were not designed to provide "a broad federal remedy for all fraud," *Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982), let alone for all negligence. If Coopers & Lybrand has been careless in certifying the registration statement and Contel relied on that statement in setting the terms of the merger, then state law might or might not provide a remedy, depending on how the state court approached issues of negligence, foreseeability, and standing. Section 11, by contrast, is remarkably stringent where it applies, readily imposing liability on ancillary parties to the registration statement (like accountants) for the benefit even of purchasers after the original offering. Its very stringency suggests that, whatever the usual rule about construing remedial securities legislation broadly (*e.g., SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963)), some care should be taken before section 11 is extended beyond its normal reading.

This is apparently a case of first impression, and virtually none of the precedents provides much assistance. Versyss' best case is *SEC v. National Securities,* 393 U.S. 453, 466, 89 S.Ct. 564, 571, 21 L.Ed.2d 668 (1969), which it offers for the proposition that the transfer of stock in a merger is a purchase or sale of securities under section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b). It is surely true under *National Securities* that the NDS stockholders

would be treated for purposes of section 10(b) as having "sold" their NDS stock and "purchased" Contel stock in return. Nothing in *National Securities* suggests, however, that Contel is to be treated as "acquir[ing]" the NDS securities. The key to the anomaly—that a sale of securities may occur without a purchaser of securities—is that the securities, although relinquished by the seller are never acquired by anyone because they cease to exist as securities (by operation of merger law) at the same time as they are relinquished.[4]

The lack of precedent for applying section 11 to our facts may mean only that the acquiring company in a merger transaction rarely relies upon statements in an earlier registration statement of the acquired corporation. On the other hand, it may be that such reliance has occurred from time to time but, when the registration statement proved false and the reliance misplaced, no one thought that section 11 applied. Even so, applying section 11 to merger acquisitions might not unfairly upset settled expectations; under section 11, accountants are held to demanding standards when they certify registration statements and are liable to remote purchasers well beyond more predictable common law limits. But section 11 does not make accountants liable to everyone for any harm remotely flowing from a false or inaccurate statement. *See Abbey v. Computer Memories, Inc.*, 634 F.Supp. 870, 875 (N.D.Cal. 1986). The problem, simply put, is to determine where Congress drew the line.

Many statutes, notably statutes of limitation, set limits that create arbitrary stopping-points for liability. Here, it has been assumed that Contel might well have a claim under section 11 if it had acquired the NDS stock in a tender offer and later merged it out of existence. It is even more clear that it would have no claim whatever if the Contel–NDS transaction had been framed as a pure acquisition of NDS *assets*. Faced with a merger transaction that fits neatly into neither category, any construction of the statute will leave discontinuities and a sense of lingering unease. For us, there is greater conformity to language and less unease in concluding that a defunct security in a non-existent corporation is not a "security" within the meaning of section 11.

The judgment of the district court is *affirmed.*

TORRUELLA, Circuit Judge (dissenting).

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k(a), provides that "any person *acquiring* [a] security" whose registration statement "contained an untrue statement of material fact or omitted to state a material fact required to be stated" may sue "every accountant ... who has with his consent been named as having prepared or certified any part of the registration statement" (emphasis added). This section should impose liability on Coopers & Lybrand in this case.

I arrive at my conclusion by reading the plain language of § 11 and deferring to the ordinary and common meaning of its words. *See Aaron v. SEC*, 446 U.S. 680, 685, 100 S.Ct. 1945, 1950, 64 L.Ed.2d 611 (1980) (construing § 17 of Securities Act of 1933 in light of plain meaning). In its plain meaning, "acquire" means "to come into possession, control, or power of disposal of often by some uncertain or unspecified means." *Webster's Third New International Dictionary* 18 (1981); *see also Black's Law Dictionary* 41 (4th ed.1951) (defining "acquire" similarly). "Security" is defined by the statute, Securities Act of 1933, § 2(1), 15 U.S.C. § 77b(1), and the

---

4. The same reasoning disposes of *Junker v. Crory*, 650 F.2d 1349 (5th Cir.1981), in which the court held that a merger may involve a purchase or sale of securities under section 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2) (condemning material misstatements or omissions in connection with such a transaction). The court there was concerned with whether the plaintiff who surrendered securities in the merged corporation and received new securities in the surviving corporation was a purchaser or seller (the court said the plaintiff was both). Once again, this case would treat the NDS stockholders as possible plaintiffs but says nothing about the status of Contel.

NDS stock, prior to the merger, was covered by this definition.

The issue in this case, as I see it, is whether Versyss ever gained possession, control or power of disposal over NDS stock. In this regard, section 2.2 of the Agreement and Plan of Reorganization, setting forth the terms of the merger, plainly states that "each share of NDS Stock ... by virtue of the Merger and without any action on the part of the holder thereof, [shall] *be converted into and exchanged for"* Contel Stock (emphasis added).

The words "be converted into and exchanged for" indicate an acquisition of NDS stock by Contel in that Contel gained possession, control, or power of disposal pursuant to the merger. That is, by virtue of the merger, Contel sold Contel securities which were issued in the merger to stockholders of NDS, and bought all shares owned by NDS stockholders. That the NDS stock ceased to exist following the consummation of the merger is of no consequence because Contel acquired the stock prior to such extinction. Indeed, Contel gained its ability to extinguish NDS stock as a result of its acquisition.

Moreover, § 11, like all securities statutes, must be construed "flexibly to effectuate its remedial purpose." *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L.Ed.2d 237 (1963); *see also Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972). In this regard, the Supreme Court has found that Congress passed § 11 to "assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983) (citations omitted). Thus, Congress imposed essentially fiduciary standards upon those who sign registration statements, including ethical and competence standards meant to ensure sound and honest business practices. H.R.Rep. No. 152, 73d Cong., 1st Sess. 23 (1933).

Accountants such as Coopers & Lybrand have a particularly heavy responsibility to the public. H.R.Rep. No. 85, 73d Cong., 1st Sess. 9 (1933).

Interpreting "acquire" to include mergers consummated by stock exchange, such as the one which occurred here, furthers these goals. In passing § 11 Congress wished to control unsound and fraudulent. business practices. Whether an acquisition occurs pursuant to a simple sale or a complex merger, the threat of such practices exists, and § 11 should protect all innocent purchasers against them.

The holding of the majority, on the contrary, precludes the application of § 11 to any merger like the one presented here, and thus allows parties to structure their transactions in the form of such a merger to circumvent the application of § 11. Such an end-run around § 11 hardly effectuates its broad remedial purpose.

As such, I dissent.