Palmer Paxton STOUTT; Rancal International, Inc.; Rancal Corp., Ltd., Plaintiffs, Appellants,

v.

BANCO POPULAR DE PUERTO RICO, Defendant, Appellee.

Euro–Atlantic Securities; ABC Insurance Co.; XYZ Insurance Co., Defendants.

No. 01–2275.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 2002.

Decided Feb. 10, 2003.

Harry Anduze Montaño with whom Raul S. Mariani Franco was on brief for appellants.

Samuel W. Seymour with whom Jeffrey J. Chapman and Sullivan & Cromwell were on brief for the appellees.

Thomas C. Baxter, Jr., Shari D. Leventhal, Federal Reserve Bank of New York, James Virgil Mattingly, Jr., General Counsel, Board of Governors of the Federal Reserve System, Richard M. Ashton, Associate General Counsel, and Stephen H. Meyer on brief for the Board of Governors of the Federal Reserve System, Amicus Curiae.

Before BOUDIN, Chief Judge, LYNCH and HOWARD, Circuit Judges.

BOUDIN, Chief Judge.

In 1997, Palmer Stoutt, together with Rancal International and Rancal Corp., companies of which Stoutt is the president, sued Banco Popular de Puerto Rico ("Banco Popular" or the "Bank") for malicious prosecution, unlawful arrest and incarceration, and defamation. The district court granted summary judgment in favor of Banco Popular based on the safe harbor provision of the Annunzio–Wiley Anti–Money Laundering Act, 31 U.S.C. § 5318 (2000),[1] which gives immunity to reports of suspected illegal activity. This appeal followed.

We recount the facts in the light most favorable to the party opposing summary judgment (here, Stoutt). *N. Am. Specialty Ins. Co. v. Lapalme,* 258 F.3d 35, 36 (1st Cir.2001). Stoutt and one or more of his companies had a continuing business relationship with Banco Popular. In June 1995, Stoutt entered into negotiations with the Bank for a five-year loan in the amount of $1.5 million. Banco Popular approved the loan conditioned on the securing of adequate collateral in the form of United States Treasury bills.

In July 1995, Stoutt contacted Euro–Atlantic Securities, a registered securities broker-dealer based in Chicago, and entered into an arrangement whereby he would lease $10 million in Treasury bills from Euro–Atlantic for $300,000 a month. Through this lease, Stoutt was told that he could both collateralize the loan from Banco Popular and invest the surplus bills in a margin account which would generate sufficient income for him to cover the lease cost.

As part of the transaction, Euro–Atlantic Securities required Stoutt to make a good faith deposit with it equal to the first month's lease cost ($300,000). To satisfy this requirement, Stoutt sought a line of credit from Banco Popular. On July 21, 1995, Banco Popular granted Stoutt—in the words of the document itself—a "commercial line of credit in the amount of $300,000 for the discretionary use to conduct the company's business affairs." Stoutt contends that Banco Popular understood the underlying Treasury bill leasing arrangement with Euro–Atlantic.

On August 28, 1995, Stoutt attempted to draw on the line of credit to make the good

---

1. The 2000 edition of the U.S. Code reflects the statute as it stood in 1995, the version that the parties agree governs this case. A 2001 amendment made some changes, USA–PA-TRIOT Act, Pub. L. 107–56, § 351(a) (2001), but is relevant here only for any light the changes may cast on the 1995 version.

faith deposit with Euro–Atlantic. José E. Guzmán, the Banco Popular manager in the Hato Rey branch with whom Stoutt was dealing, refused the request for reasons that are disputed. According to Stoutt, Guzmán said that if Stoutt deposited in his Banco Popular account a check drawn on his account in another bank, the Bank would pay on an "uncollected funds" basis, i.e., that it would allow withdrawal immediately without waiting for the deposited check to clear. See Black's Law Dictionary 1526 (7th ed.1999).

Stoutt told Guzmán that he controlled only one other checking account, which had just been established at the Citibank branch in Miami. Guzmán allegedly told Stoutt that if the Citibank check were returned unpaid to Banco Popular, Banco Popular could initially cover the overdraft by allowing an advance on the line of credit. That afternoon, Stoutt deposited into the Banco Popular account of an affiliated Rancal company a $300,000 check drawn on Rancal's Citibank account.

Stoutt apparently believed that sufficient profits from the investment of surplus Treasury bills leased from Euro–Atlantic would arrive in the Citibank account in time to cover the check. Yet when Banco Popular presented Stoutt's check to Citibank, the check was dishonored for insufficient funds and thereafter dishonored a second time. In the meantime, Stoutt had already transferred out $300,000 from his Banco Popular account (credited there based upon his Citibank check) to make his deposit with Euro–Atlantic Securities, so his Banco Popular account was now overdrawn by $300,000.

In late September 1995, Stoutt discovered that the Euro–Atlantic Securities transaction was apparently a scam directed against him and that he had lost his good faith deposit without securing the promised Treasury bills. In October, he contacted the Securities and Exchange Commission, the United States Attorney's office in Chicago, and the National Association of Securities Dealers. He also retained a lawyer to help him recover the $300,000.

The size of Stoutt's overdraft alerted officials at Banco Popular. Meetings were held in October 1995 between him and Banco Popular officials, and internally within Banco Popular. At one such meeting, some Banco Popular officials concluded that Stoutt was engaged in check kiting. Check kiting—knowingly writing a check against an account with insufficient funds—can amount to an offense under federal bank fraud law. 18 U.S.C. § 1344 (2000); United States v. Fontana, 948 F.2d 796, 799 (1st Cir.1991).

On November 13, 1995, Banco Popular filed a criminal referral form ("CRF") with the FBI. 12 C.F.R. § 208.20 (1995). The CRF, a predecessor of the suspicious activity report ("SAR") under current law, 12 C.F.R. § 208.62 (2002), was required to be filed in various situations. The language of the CRF, though opaque in parts, clearly applied if Banco Popular suspected that possible criminal activity had inflicted on it a potential loss of more than $5,000. See 12 C.F.R. § 208.20(c)(2), (3) (1995).[2] In this case, Banco Popular's CRF stated that the suspected violation appeared to be an isolated incident of check kiting.

The FBI, after discussions with Banco Popular employees, began a criminal investigation of Stoutt and he was ultimately

---

2. Read literally, the regulation required the reporting of a $5,000 loss without regard to suspicions of criminal activity and it may have been so intended. See 12 C.F.R. § 208.20(c)(3) (1995). The current SAR regulation raises the dollar figures and requires a suspicion of criminal activity in all cases. 12 C.F.R. § 208.62(c)(2), (3) (2002).

arrested. A federal grand jury indicted him for bank fraud on December 6, 1995. In early 1996, the United States voluntarily dismissed the charges without prejudice for reasons that are unclear. Conceivably, the prosecutor on reflection thought this a marginal case in which a jury might deem Stoutt more negligent (and gullible) than consciously fraudulent.

■ On December 4, 1997, Stoutt and his two corporate co-plaintiffs sued Banco Popular in the federal court in Puerto Rico for a variety of local-law torts (already listed) flowing from Banco Popular's report to and subsequent contact with the FBI, as well as a *Bivens* claim under the Fourth Amendment for false arrest. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 395–96, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). After discovery the district court in July 2001 granted the Bank's motion for summary judgment, holding that the Bank was entitled to absolute immunity under the safe harbor provision of 31 U.S.C. § 5318(g)(3). *Stoutt v. Banco Popular de P.R.*, 158 F.Supp.2d 167, 175 (D.P.R.2001). On appeal, Stoutt argues on various grounds that the Bank was not entitled to immunity. Our review is *de novo*. *United States v. Howard*, 996 F.2d 1320, 1327–28 (1st Cir.1993).

At the time of the transactions and the lawsuit, the immunity provision read, in pertinent part, as follows:

Any financial institution that makes a disclosure of any possible violation of law or regulation or a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution, shall not be liable to any person under any law or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof ... for such disclosure....

31 U.S.C. § 5318(g)(3).[3]

Stoutt makes two core arguments—along with several variations—to avoid the immunity statute (a further argument, pertaining only to the *Bivens* claim, is discussed below): first, that the Bank's disclosures in follow-up discussions with the FBI, *after* the filing of the CRF itself, fall outside the scope of the statute's protection; and second, that the statute, read in light of the regulations, implicitly requires that any suspicions conveyed to the authorities be held in good faith—a requirement that Stoutt says cannot be met here because the Bank knew that Stoutt was innocent of criminal conduct.

■ The statute offers two different categories of coverage: one is for "disclosure of any possible violation of law or regulation"; the other, for disclosure "pursuant to this subsection or any other authority." The latter clause presumably embraces reports required by 31 U.S.C. § 5318(g)(1) (which empowers the Secretary of the Treasury to compel the filing of reports) or other comparable authority. Perhaps it is arguable that disclosure under the "pursuant to" clause must be tied back to some legal mandate for disclosure

---

**3.** 31 U.S.C. § 5318(g)(3) was modified in 2001 (see note 1, above) and redesignated as 31 U.S.C. § 5318(g)(3)(A). In pertinent part, it now reads as follows (with added language highlighted):

Any financial institution that makes a *voluntary* disclosure of any possible violation. of law or regulation *to a government agency* or *makes* a disclosure pursuant to this subsection

or any other authority, and any director, officer, employee, or agent of such institution *who makes, or requires another to make any such disclosure,* shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision *of any State* ... for such disclosure....

and so encompasses the CRF but not the follow-up discussions.

But, as just noted, the statute also protects disclosures of "any possible violation of law or regulation," even if not tied to any legal mandate. The original CRF report was cast as the disclosure of a possible case of bank fraud, assuredly a possible violation of law. Conceivably, the answers to follow-up inquiries by the FBI directed to the details of the transaction could be distinguished from "disclosure" of a possible violation, since the details relate to an already disclosed violation. But this is not a very sensible reading given the purpose of the statute: if the original core disclosure was text, ordinary follow-up answers to investigators would be footnotes and should be similarly protected.

Conceivably, Stoutt could argue that the report was not one of a possible violation, even though so termed and colorably disclosing a possible crime, if the Bank knew that there was (in reality) no violation. But this is a non-literal reading of the statute, which speaks of "any possible violation," and we think it more straightforward to confront any requirement of good faith or due care as an implied qualification of immunity rather than an issue of initial scope. Here, whatever its internal beliefs, the Bank did by any objective test identify a "possible violation."

Stoutt makes a somewhat different "coverage" argument in claiming that the *regulations* require that the bank must actually suspect that a violation of law has occurred. The short answer is that immunity depends on the regulations only where the immunity is sought for disclosures "pursuant" to the requirements imposed under subsection 5318(g) or other authori-

ty.[4] In this case, the disclosure is independently protected by the earlier clause of the then-existing statute covering disclosure of any "possible violation of law or regulation."

In his second core argument, Stoutt urges that at the very least the protection should be conditioned upon a finding of good faith on the part of the reporting entity. This is a colorable argument, accepted by the Eleventh Circuit but rejected by the Second. *Compare Lopez v. First Union Nat'l Bank of Fla.*, 129 F.3d 1186, 1192–93 (11th Cir.1997), *with Lee v. Bankers Trust Co.*, 166 F.3d 540, 544–45 (2d Cir.1999). We side with the Second Circuit, a position supported by an amicus brief of the Board of Governors of the Federal Reserve System. The statutory issue is one of continuing importance and should be cleanly resolved for this circuit.

Although the statute does not in literal terms include a good faith requirement, the omission of such language is not conclusive. *Compare, e.g., Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 122 S.Ct. 1230, 1237–38, 152 L.Ed.2d 258 (2002) (declining to read knowledge requirement into statutory silence); *with Field v. Mans*, 516 U.S. 59, 66–77, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (importing "justifiable reliance" requirement into statutory silence). Courts have often added to statutes unexpressed conditions or qualifications consonant with statutory purpose or other public concerns; the most familiar example is the host of case-law doctrines tolling limitations statutes for equitable and related reasons. *See, e.g., David v. Hall*, 318 F.3d 343, 345–46 (1st Cir.2003) (collecting cases).

---

4. This strand of Stoutt's coverage argument is also unavailing for a number of other reasons, including his reliance on a post–*1995* version of the regulations which add new and critical language, arguably narrowing earlier reporting requirements (see note 2, above).

Still, this merely poses the question whether such a qualification should be "read into" the statute. As with any question of statutory construction, there is a trinity of dominant considerations—language, legislative history, and policy. *See Versyss, Inc. v. Coopers & Lybrand*, 982 F.2d 653, 654 (1st Cir.1992), *cert. denied*, 508 U.S. 974, 113 S.Ct. 2965, 125 L.Ed.2d 665 (1993). Here, two of the three (language and history) favor the conclusion that no good faith qualification should be read into the statute, while the balance of policy concerns is equivocal.

Language, the starting (and sometimes the stopping) point in statutory construction, has already been mentioned. The absence of an express qualification is not decisive but counts for something. This is especially so here where a good faith requirement is so obvious a possibility for inclusion by Congress—given the common law tradition discussed below—and where it would have taken only a simple drafting adjustment. *See, e.g.,* 42 U.S.C. § 5106a(b)(2)(A)(iv) (2000) (state child abuse prevention plan to include immunity for "good faith" reports).

■ Turning to legislative history, it is certainly easy enough to imagine a purpose for this statute that would yet be consistent with requiring good faith. At common law one who reports suspected criminal conduct already has a privilege, but a privilege often taken to require both a reasonable basis for the report and good faith. *See, e.g., Murphree v. U.S. Bank of Utah, N.A.*, 293 F.3d 1220, 1222–23 (10th Cir.2002); *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 410 (2d Cir.2000); Sack, *Libel, Slander & Related Problems*, § 7.3.6, at 463–65 (1994 ed.). Absent other evidence Congress could have meant only to remove the objective reasonableness requirement and to leave an (implicit) requirement of subjective good faith, even if unreasonably based.

But against this is the statement of the author of the provision (there is no pertinent committee report language) that it was intended to provide "the broadest possible exemption from civil liability for the reporting of suspicious transactions." 139 Cong. Rec. E57–02 (1993). This language may also give greater weight than usual to the removal before final enactment of a good faith requirement that was at one time in the proposed immunity provision. *Compare* 137 Cong. Rec. S16640, S16642, S16647 (1991) (amendment of Senator D'Amato), *with* 137 Cong. Rec. S17910, S17969 (1991) (bill as passed by the Senate), *and* 31 U.S.C. § 5318(g)(3).

Turning finally to Congress's policy, the obvious arguments in this case for a good faith limitation are two: that a good faith requirement would not wholly (or perhaps even greatly) discourage the reports intended by Congress, *cf., United States v. Rodgers*, 466 U.S. 475, 483–84, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984), and that, without it, individuals like Stoutt could be left without any civil redress against malicious or wholly unfounded accusations. The former argument has some force at least as to "voluntary" reports. The latter argument for a good faith qualification has obvious weight.

■ On the other hand, any qualification on immunity poses practical problems. A requirement of objective reasonableness—which is typically required for qualified immunity in federal civil rights cases, *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)—obviously creates a risk of second guessing; but, so too does a requirement of subjective good faith. Indeed, the latter might seem to give the reporting entity a further margin of protection by shielding honest if careless error but, cutting the

other way, subjective good faith requirements work against summary judgment, exposing reporters to an increased risk of trial. *Id.* at 815–16, 102 S.Ct. 2727.

As to the risk of false charges, ordinarily the disclosures will as a practical matter be made to the authorities, who provide their own filter as to what investigations are pursued and made public. A subsequent "technical and clarifying" amendment in 2001 said that protected disclosures are those made to "a government agency." H.R. Rep. 107–250, pt. 1, at 66 (2001). This leaves open the separate question (not here presented) of internal intra-corporate disclosures antecedent to reporting to the government.

Finally, remedies other than private damage actions are available for wilfully false reports: private sanctions such as employment termination, and government penalties such as fines and imprisonment, *e.g.,* 18 U.S.C. § 1001 (2000) (false statements an offense); *id.* § 1517 (2000) (obstruction of examination of banks an offense). The 1995 statute says that the disclosing entity shall not be liable "to any person"—an obvious reference to private civil remedies and not to government sanctions for bad faith reporting. *See* 139 Cong. Rec. E57–02 (immunity from "civil liability"). The 2001 amendment confirmed that anyone immunized under the safe harbor provision is still subject to enforcement actions by governments. USA–PATRIOT Act, Pub.L. 107–56, § 351(a) (adding 31 U.S.C. § 5318(g)(3)(B)); *see also* H.R. Rep. 107–250, pt. 1, at 66.

Our construction of the statute makes it unnecessary to consider Stoutt's claims that the disclosures were unfounded, incomplete, careless and even "malicious." Nevertheless, despite extensive discovery allowed to Stoutt, we see little basis in fact for any of these labels so far as the Bank is concerned. About as close as Stoutt gets to providing any factual support for his claim is his repeated assertion that he disclosed to Guzmán the nature of his transaction with Euro–Atlantic Securities and was encouraged to draw on uncollected funds.

We will assume *arguendo* that all of this was so (although Guzmán denies being told of the insufficient funds in Stoutt's Citibank account) and will also assume (debatably) that anything said to Guzmán should be attributed to the Bank. Nevertheless, drawing a check on an account where one knows one has no funds *could* be a criminal violation, regardless of what disclosures were made to individual bank officials, and the statute requires only a report of a "possible" violation. Since objectively there was a possible violation, it is hard to think that the Bank could be found to have acted in bad faith. Stoutt has admitted that he knew there were insufficient funds and that he knew what he was doing was wrong.

Stoutt's final argument is that no statutory immunity could apply to his *Bivens* claim—a view seemingly adopted by the district court—and that the district court's dismissal of the *Bivens* claim on other grounds was itself error. *See Stoutt,* 158 F.Supp.2d at 175. The district court's initial concern is colorable: The immunity provision protects against liability "under any law or regulation of the United States" and, by contrast, under "any constitution, law, or regulation of any State or political subdivision thereof." Nevertheless, there is a substantial basis for applying the immunity provision to *Bivens* claims as well as ordinary torts.

■ Congress surely has power to impose limitations on *Bivens* actions. Recently, Congress imposed an administrative exhaustion requirement on all prison

suits, 42 U.S.C. § 1997e(a) (2000), countering a Supreme Court decision that refused to apply such a requirement to *Bivens* actions unless the administrative remedy was adequate.[5] And the common-law absolute immunity of witnesses is a well-recognized limitation on constitutional as well as other torts. *See Cleavinger v. Saxner,* 474 U.S. 193, 200, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985).

■ The only debatable question is whether the *Bivens* claim is one "under any law or regulation" of the United States or whether the contrary is suggested by the contrasting reference to state "constitutions." Although literal language on this point might seem helpful to Stoutt, the Supreme Court had no difficulty concluding that *Bivens* claims are within the meaning of "any other Federal law" under 42 U.S.C. § 1997e(a). *Porter,* 122 S.Ct. at 988. Only the juxtaposed reference to state constitutions provides any basis for arguing that the "law or regulation" clause was intended to exclude *Bivens* claims.

Possibly, Congress thought of the *Bivens* issue and resolved doubts against such immunity. Perhaps more likely, it never focused on *Bivens* actions at all; *Bivens* actions are normally brought against government officers—not banks. Congress may very well have imagined that "laws and regulations" offered full protection against plausible *federal* claims, adding state constitutions only because no one could be sure what liabilities might be imposed by 50 different documents. There is no obvious policy reason for excluding *Bivens* claims from the statute.

Although doubtful about the district court's premise that *Bivens* actions are

excluded from the immunity provision, we are content to leave the issue to a case where it matters, assuming that it ever does matter. The Supreme Court has already limited *Bivens* actions by refusing to extend them to private entities acting under color of federal law. *Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 122 S.Ct. 515, 519, 151 L.Ed.2d 456 (2001). Here, the Bank's connection with the arrest is even more attenuated; it did no more than supply information required by law. *See* 12 C.F.R. § 208.20(i) (1995) (non-disclosure subject to sanction). There was no *Bivens* violation by the Bank.

Assuredly, under the safe harbor provision, careless or malicious reporting is possible. Thus, the statute, whether read broadly or narrowly, means that some "wrongs" will go unredressed. But this is neither novel nor decisive: "rights" are regularly limited or defeated by privileges, immunities and other defenses of many kinds. *E.g., Cleavinger,* 474 U.S. at 199–200, 106 S.Ct. 496; *Harlow,* 457 U.S. at 818–19, 102 S.Ct. 2727. In truth, all "rights" are limited by countervailing concerns and interests. The distinction that calls some of these limitations ones on "remedy" is largely a verbal convenience. Happily in this case, there is no threat of injustice.

*Affirmed.*

---

5. *Compare McCarthy v. Madigan,* 503 U.S. 140, 149–51, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (refusing to apply then-existing section 1997e by analogy to *Bivens* claims), *with Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002) (applying amended section 1997e(a) to *Bivens* actions), *and Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 1825, 149 L.Ed.2d 958 (2001) (amended section 1997e(a) overruled *McCarthy*).