# United States Court of Appeals
## For the First Circuit

No. 18-1884

AER ADVISORS, INC.; WILLIAM J. DEUTSCH; PETER E. DEUTSCH,

Plaintiffs, Appellants,

v.

FIDELITY BROKERAGE SERVICES, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Thompson, Circuit Judge,
Souter,* Associate Justice,
and Lipez, Circuit Judge.

David Graff, with whom Graff Silverstein LLP, Howard Graff, Arent Fox LLP, Irwin B. Schwartz, Nicholas R. Cassie, and BLA Schwartz, PC were on brief, for appellants.
Christopher R.J. Pace, with whom Christopher M. Morrison and Jones Day were on brief, for appellee.
Ira D. Hammerman, Kevin M. Carroll, Securities Industry and Financial Markets Association, Colleen P. Mahoney, James R. Carroll, Alisha Q. Nanda, Immanuel R. Foster, Skadden, Arps, Slate, Meagher & Flom LLP, on brief for the Securities Industry and Financial Markets Association (SIFMA), amicus curiae in support of affirmance.

---

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

April 17, 2019

**THOMPSON, Circuit Judge**.  William and Peter Deutsch, father and son, together with their financial advisor, AER Advisors ("AER"), ask us to undo the district judge's decision dismissing their complaint against Fidelity Brokerage Services, LLC ("Fidelity") under Fed. R. Civ. P. 12(b)(6).[1]  The judge had deemed Fidelity immune from suit here based on an immunity provision in the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5318(g)(3)(A) — a provision that says, most pertinently, that a "financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency . . . shall not be liable to any person under any law or regulation of the United States, [or] any constitution, law, or regulation of any State . . ., for such disclosure."  Seeing no reason to reverse the judge's thoughtful decision, we affirm.

## How the Case Got Here

We draw the facts from the complaint's allegations, which at this stage of the litigation we must accept as true and construe in the light most favorable to plaintiffs.  See, e.g., Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).

---

[1] For convenience, we will sometimes refer to AER, William Deutsch, and Peter Deutsch, collectively, as "plaintiffs."

- 3 -

*Parties' Dealings*

At all times relevant to this suit, AER operated as a registered investment advisor, serving wealthy clients nationally. In 2009, AER joined Fidelity's Wealth Central platform, giving it access to Fidelity's investment technologies — technologies that AER relied on in advising its clients. William and Peter were two of AER's clients. And they were and are, respectively, chairman and chief executive officer of a billion-dollar company called Deutsch Family Wine & Spirits.

Starting in 2011 and continuing through part of 2012, the Deutsches pursued a "China Gold" investment strategy introduced by AER and supported by Fidelity — a strategy that resulted in their acquiring millions of shares of China Medical Technologies, Inc. ("China Medical"), all in the hopes of making a profit from an eventual management buy-out or a third-party acquisition of that company. In March 2012, Fidelity offered the Deutsches the chance to participate in its "fully paid lending program," in which they would lend Fidelity their China Medical shares for an interest-based fee. If they accepted Fidelity's offer, they probably would have been able to engineer a "short squeeze."[2] But they declined, saying they had no interest in lending stock.

_____

[2] A "short squeeze" involves a

- 4 -

Apparently unwilling to take no for an answer, Fidelity

lent about 1.8 million of the Deutsches' China Medical shares to

---

situation when prices of a stock . . . start to move up sharply and many traders with short positions are forced to buy stocks or commodities . . . to cover their positions and prevent losses. This sudden surge of buying leads to even higher prices, further aggravating the losses of short sellers who have not covered their positions.

Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1277 n.3 (11th Cir. 2005) (quoting John Downes & Jordan Elliot Goodman, *Barron's Finance & Investment Handbook* 807 (6th ed. 2003)), abrogated on other grounds by Merck & Co. v. Reynolds, 559 U.S. 633 (2010). To bring a little more clarity to the matter, we note that a "short position" — mentioned in the short-squeeze definition — is a technique used by some investors. As a leading treatise explains:

A "short sale" is . . . any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller. Short selling can be a logical trading strategy for a trader who believes that the price of shares is likely to decline over the near-term. To sell short, the trader typically borrows the shares from a broker who obtains them either from its own reserves or from an external source. The trader then sells the borrowed shares in the open market. At this point, the trader has an "open short position" in the stock. At some point in the future, the trader "covers" the short position by purchasing an identical number of shares and returning them to the lender. [If,] as the trader hopes, the share price declines, the trader earns a profit equal to the difference between the price at which she sold short and the price at which she purchased the shares back to cover the short position (not taking into account fees or commissions). Short selling can be extremely risky because if the stock price rises, the trader must cover the short position at a loss.

23A Jerry W. Markham and Thomas Lee Hazen, *Broker-Dealer Operations Sec. & Comm. Law* § 9.7 (citations and some internal quotation marks omitted) (quoting SEC v. Colonial Inv. Mgmt. LLC, 659 F. Supp. 2d 467, 470 (S.D.N.Y. 2009), aff'd, 381 F. App'x 27 (2d Cir. 2010)).

short sellers or their brokers between May and early June 2012. Fidelity made money from these loans. But the Deutsches got nothing — no notice of what Fidelity was up to, no collateral to protect their interests, and no compensation.

On June 11, 2012, after "a routine monthly transfer of [China Medical] shares between the Deutsches' margin accounts," Fidelity's surreptitious lending triggered a recall obligation, basically because Fidelity had loaned more China Medical securities than legally permitted (fyi, all dates in the rest of this paragraph refer to 2012 as well). Over the next several days, Fidelity issued recall notices for about 1.8 million shares. The recalls for about 1.2 million shares failed, however, causing Fidelity to believe a short squeeze would occur. Ultimately, China Medical's stock price went from $4.00 per share on June 13 to $11.80 per share on June 29. Fidelity ended up buying roughly 1.2 million shares on the open market between June 19 and June 27. And the Securities and Exchange Commission ("SEC") halted trading in China Medical securities on July 29.

*Investigations*

Sometime around July 5, 2012, Fidelity filed a suspicious activity report ("SAR") with the federal Treasury Department's Financial Crimes Enforcement Network, accusing the Deutsches of manipulating China Medical's stock price. Plaintiffs base this allegation on an internal memo written by David Whitlock,

- 6 -

an employee in Fidelity's Compliance Department, which they say "upon information and belief . . . reflects the contents" of the SAR.[3]  Whitlock's memo recommended that Fidelity's Investigations, Evaluation and Response Department investigate the Deutsches' China Medical-related activities because they had "the appearance of attempting to influence a short squeeze in the stock of China Medical."  And "a scheme to manipulate the price or availability of stock in order to cause a short squeeze is illegal," his memo added.

In August 2012, the SEC kicked off an investigation of both AER and Peter Deutsch for (in plaintiffs' words) "possible market manipulation in the equities of China Medical."  AER, for example, received one SEC subpoena and participated in one SEC interview.  Peter also participated in one SEC interview.  State securities agencies investigated AER as well.  William was not investigated at all, apparently (he makes no allegation that he was).  Ultimately, neither the SEC nor the state agencies pursued enforcement actions against AER or Peter.  Still, AER had to spend

_____

[3] Because a major goal of the BSA is to help law enforcement react quickly to evidence of financial chicanery, federal law mandates that SARs be kept confidential so that the SARs' subjects do not learn that they have come under suspicion.  In fact, federal law forbids financial institutions, government authorities, and their respective employees from disclosing SARs or even "any information that would reveal the[ir] existence."  31 C.F.R. § 1023.320(e)(1)(i); 31 U.S.C. § 5318(g)(2)(A).  Indeed, federal law makes it a federal crime to willfully disclose the existence or contents of an SAR.  See 31 U.S.C. § 5322(a).

hundreds of thousands of dollars in defending itself and did not "economically recover" from the ordeal. Peter had to spend hundreds of thousands of dollars too and suffered emotional distress as well.

*Proceedings in the Southern District of Florida*

Invoking diversity jurisdiction, the Deutsches and AER later sued Fidelity in Florida's federal district court. Their operative complaint contained an array of Florida-law claims, including claims predicated on the SAR — *e.g.*, negligent reporting and misrepresentation, fraud, and tortious interference with existing and prospective business relations.

Fidelity eventually moved to dismiss the complaint or to transfer the case to Massachusetts's federal district court. Most pertinently for our purposes, Fidelity's dismissal arguments pushed the idea that the BSA immunized it from any civil liability for filing the SAR. And its transfer arguments pushed the notion that all the events leading to the suit happened in or around Massachusetts. Plaintiffs opposed the motion, contending among other things that the BSA did not shield Fidelity from liability for its "bad faith" filing of the SAR and that Florida was a reasonably convenient forum for all concerned.

Noting "the vast majority of the facts underpinning [p]laintiffs' cause[s] of action did not occur in . . . Florida," the federal district court in Florida held that "the locus of

operative facts in this case favors a transfer to the District of Massachusetts."  So that court transferred the action to Massachusetts under 28 U.S.C. § 1404(a) and denied Fidelity's "other arguments and requests" as moot.[4]  To use some legalese, the Florida federal court here was the "transferor court" and the Massachusetts federal court was the "transferee court."  See Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex., 571 U.S. 49, 64-65 (2013).

*Proceedings in the District of Massachusetts*

Again asserting diversity jurisdiction, plaintiffs filed an amended complaint after the transfer, alleging Florida-law claims for negligent reporting, interference with existing and prospective business relations, breach of contract, breach of good faith and fair dealing, promissory estoppel, breach of fiduciary duty, unjust enrichment, negligence or gross negligence, deceptive and unfair trade practices, and *prima facie* tort.  A common theme in each claim was that Fidelity filed an SAR falsely accusing

---

[4] Section 1404(a) states that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

- 9 -

plaintiffs of trying to manipulate the market for China Medical stock, which sparked the governmental investigations.

Fidelity responded with a motion to dismiss the complaint. First Fidelity argued that First Circuit law applied to federal questions transferred here under § 1404(a). Then citing Stoutt v. Banco Popular de Puerto Rico, 320 F.3d 26 (1st Cir. 2003), Fidelity wrote "that the BSA provides a financial institution with *absolute immunity* from civil liability for filing a[n] SAR." The provision Fidelity relied on says (as we said earlier) that a "financial institution that makes a voluntary disclosure of *any possible violation of law* or regulation to a government agency . . . shall not be liable to any person under any law or regulation of the United States, [or] any constitution, law, or regulation of any State . . ., for such disclosure." See 31 U.S.C. § 5318(g)(3)(A) (emphasis added). Keep the italicized phrase "any possible violation of law" in mind.

Plaintiffs opposed the motion, arguing that the § 1404(a) transfer left the applicable law unaffected. Which meant Eleventh Circuit law, specifically Lopez v. First Union National Bank of Florida, 129 F.3d 1186 (11th Cir. 1997), controlled and (to quote their memo) holds "that immunity may be conferred in this case (transferred from Florida District Court) only with respect to a[n] SAR filing made in good faith." And, plaintiffs continued, because Fidelity used the SAR "as a smoke screen to

- 10 -

camouflage [its] own contraventions of law" and did not "objective[ly] identif[y] a possible violation" by plaintiffs, Fidelity's "bad faith" filing precluded a grant of immunity under the BSA.

Taking up the motion, the district judge wrote that when federal-law questions arise, "the transferee court will apply the law of its own circuit" — a "general rule" that "applies with equal force where a transferee court is considering a federal statutory defense in a diversity case." AER Advisors Inc. v. Fidelity Brokerage Servs. LLC, 327 F. Supp. 3d 278, 284 (D. Mass. 2018). And with that, the judge applied this Circuit's interpretation of the BSA. Id.

Relying on Stoutt, the judge then wrote that the BSA grants financial institutions "absolute immunity from suit, even when [their] disclosures are fabricated or made with malice" — in other words, there is no "good faith qualification to [civil] immunity," meaning this immunity applies even to fraudulent SARs filed by an institution to "falsely point blame at others to cover up its own wrongdoing." AER Advisors Inc., 327 F. Supp. 3d at 284-85 (discussing Stoutt, 320 F.3d at 30-33). The judge also rejected plaintiffs' theory that Fidelity's SAR could not have stated a "possible violation of law." Id. at 285. Even if Fidelity "'knew that there was (in reality) no violation,'" the judge reasoned, "[b]ased on [p]laintiffs' own allegations, the SAR . . .

- 11 -

'was cast' as a disclosure of a possible violation of securities law." Id. (quoting Stoutt, 320 F.3d at 30). Criminal law, the judge added, is the mechanism to deter and remedy false reports to the government, whose agents are quite capable of "filter[ing] out SARs reporting 'false charges' and decid[ing] not to pursue those investigations." Id. (quoting Stoutt, 320 F.3d at 32). So the judge dismissed the case under Rule 12(b)(6). Id. at 280.

**The Parties' Principal Appellate Arguments**

Unhappy with the judge's ruling, plaintiffs appeal, making two basic arguments (echoing their positions in the district court). One is that Eleventh Circuit precedent applies because the case came to our Circuit via a transfer order from a court in the Eleventh Circuit. And, plaintiffs say, Eleventh Circuit precedent holds that BSA immunity requires a good-faith filing — a requirement not met here because Fidelity filed "an intentionally misleading SAR . . . to cover up [its] own wrongdoing." The second argument is that even if First Circuit precedent applies, we (in their words) must not read the BSA as "immuniz[ing] an institution that filed a report disclosing an objectively impossible violation that falsely implicated the victim of the financial institution's *own* wrongdoing — leading the government to investigate the victim rather than the perpetrator." To let Fidelity escape scot-free would frustrate the congressional purpose behind the BSA, which is to help "law enforcement by incentivizing reports of violations of

law" — "not to incentivize the issuance of reports that will be of no use to law enforcement; i.e., reported facts that could not possibly constitute a violation of law" (quotations taken from their brief).  And they insist that a trio of state-court opinions support their view of how BSA immunity should work.

Fidelity, for its part, thinks that plaintiffs are wrong across the board (repeating what they argued below).  Courts of appeals, Fidelity writes, regularly hold "that a district court" must "appl[y] the law of its own Circuit to federal questions (such as whether BSA immunity applies to Fidelity), including in cases transferred from another Circuit."  So, Fidelity continues, Stoutt applies and gives "a financial institution . . .  BSA immunity even if it files a[n] SAR that is 'wholly unfounded'" (the interior quotation is from Stoutt, 320 F.3d at 31).  On the public-policy front, Fidelity writes that "[u]nqualified BSA immunity" is key to the SAR regime — to create an atmosphere that encourages financial institutions to report dishonest-looking activities without the fear of reprisals in civil lawsuits.  And finally, Fidelity protests that the state-court cases plaintiffs champion cannot trump our Stoutt opinion.

## The Standard of Review

We review the judge's dismissal decision with fresh eyes, knowing that she could grant Fidelity's BSA-immunity-based dismissal motion only if, after taking the complaint's well-

- 13 -

pleaded facts as true and drawing every reasonable inference in plaintiffs' favor, see Schatz, 669 F.3d at 55, the facts establishing Fidelity's immunity "are clear on the face of . . . plaintiff[s'] pleading[]," see Medina-Padilla v. U.S. Aviation Underwriters, Inc., 815 F.3d 83, 85 (1st Cir. 2016); see also DeGrandis v. Children's Hosp. Boston, 806 F.3d 13, 16 (1st. Cir. 2015).

**Our Take**

*First Circuit Law Governs this Case*

First up is plaintiffs' claim that the judge should have applied the Eleventh Circuit's interpretation of BSA immunity in Lopez, not our interpretation in Stoutt. Unfortunately for plaintiffs, however, we — like Fidelity — side with the district judge on this issue. And we spill a bit of ink to explain why.

While we have yet to consider the subject, every Circuit to do so has concluded that when one district court transfers a case to another, the norm is that the transferee court applies its own Circuit's cases on the meaning of federal law — and for a good reason: as Justice (then Judge) Ginsburg pithily put it, in "the adjudication of federal claims," federal courts ordinarily "comprise a single system in which each tribunal endeavors to apply a single body of law," and if different circuits view federal law differently, then the Supreme Court can restore "uniformity." In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1175,

- 14 -

1176 (D.C. Cir. 1987) (brackets and internal quotation marks omitted), aff'd on other grounds sub nom. Chan v. Korean Air Lines, Ltd., 490 U.S. 122 (1989).[5]  Notably, and as footnote 5 of our opinion shows, even the Eleventh Circuit — the very Circuit whose law plaintiffs say should apply — flatly rejects the notion that a transferee court must always use the transferor Circuit's interpretation of federal law.  See Murphy, 208 F.3d at 966

---

[5] Cases from the Second, Fourth, Fifth, Eighth, Ninth, and Eleventh Circuits come out the same way.  See Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (noting that "a transferee federal court should apply its interpretations of federal law, not the construction of federal law of the transferor circuit"); Bradley v. United States, 161 F.3d 777, 782 n.4 (4th Cir. 1998) (explaining that "this court cannot and does not apply the law of another circuit simply because the case was transferred from the other circuit"); Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1138 (5th Cir. 1992) (emphasizing that "[w]hen a case is transferred from a district in another circuit, the precedent of the circuit court encompassing the transferee district court applies to the case on matters of federal law"); In re TMJ Implants Prods. Liab. Litig., 97 F.3d 1050, 1055 (8th Cir. 1996) (agreeing that "[w]hen analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located"); Newton v. Thomason, 22 F.3d 1455, 1460 (9th Cir. 1994) (declaring that "when reviewing federal claims, a transferee court in this circuit is bound only by our circuit's precedent"); Murphy v. FDIC, 208 F.3d 959, 964, 966 (11th Cir. 2000) (holding that a "transferee court should apply its own interpretation of federal law").  And cases from the Seventh and Tenth Circuits reached the same conclusion, albeit in dicta.  See Eckstein v. Balcor Film Inv'rs, 8 F.3d 1121, 1126 (7th Cir. 1993) (pointing out that although "Congress might require one federal court to apply another's interpretation of federal law, . . . § 1404(a) does not itself do so," and "agree[ing] with Korean Air Lines that a transferee court normally should use its own best judgment about the meaning of federal law when evaluating a federal claim"); Olcott v. Del. Flood Co., 76 F.3d 1538, 1546 (10th Cir. 1996) (same).  We will have more to say about Eckstein and Olcott later.

(concluding that in dealing with a federal common-law defense, the transferee court correctly applied its own Circuit's law instead of the transferor Circuit's law — the rationale being that "[s]ince the federal courts are all interpreting the same federal law, uniformity does not require that transferee courts defer to the law of the transferor circuit"). Persuaded by their legal analyses, today we join those Circuits and thus conclude that First Circuit law governs this case.

Hold on, plaintiffs insist: two Supreme Court opinions — Van Dusen v. Barrack, 376 U.S. 612, 636 (1964), and Ferens v. John Deere Co., 494 U.S. 516, 522-23 (1990) — say that a transfer under § 1404(a) accomplishes "a change in courtrooms" only, not "a change of law." Which means, according to plaintiffs, the law of the transferor Circuit — here, Eleventh Circuit law — always follows the case. Though artfully presented, this argument is not a difference-maker.

Van Dusen and Ferens say that if a federal court transfers a diversity case under § 1404(a), the transferee court applies the *state law* that the transferor court would have applied to any questions of *state law*. See Van Dusen, 376 U.S. at 627; Ferens, 494 U.S. at 524-25. Van Dusen, for example, held that "where the defendants seek transfer, the transferee district court must be obligated to apply the *state law* that would have been applied if there had been no change of venue" — in other words, a

venue change "under § 1404(a) generally should be, *with respect to state law*, but a change of courtrooms." See 376 U.S. at 639 (emphasis added). Van Dusen left open the question whether the same rule "would govern if a plaintiff," rather than a defendant, "sought transfer under § 1404(a)." Id. at 640. Ferens answered that question by holding "that the transferor law should apply regardless of who makes the § 1404(a) motion." 494 U.S. at 531.

Van Dusen and Ferens are diversity cases. And with diversity cases, federalism commands that federal judges apply state substantive law exactly as a state court would, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) — a rule that aims to accomplish two things: prevent forum-shopping, "which had been encouraged by a regime in which the choice of state or federal court might determine what substantive law would govern the litigation," S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist., 60 F.3d 305, 309 (7th Cir. 1995) (Posner, C.J.); and "avoid[]" the "inequitable administration of the laws," Hanna v. Plumer, 380 U.S. 460, 468 (1965).[6] Ultimately, and importantly here, the concern animating Erie — maintaining the dual dignity of our state and federal systems — animates Van Dusen and Ferens too. See Van Dusen, 376 U.S. at 638 (explaining that in "[a]pplying" Erie's

---

[6] Actually, though Erie's rule comes into play most often in diversity cases, it also applies to state-law claims brought to federal court via supplemental jurisdiction. See Felder v. Casey, 487 U.S. 131, 151 (1988).

"analysis to § 1404(a)," courts "should ensure that the 'accident' of federal diversity jurisdiction does not enable a party to utilize a transfer to achieve a result in federal court which could not have been achieved in the courts of the State where the action was filed"); Ferens, 494 U.S. at 524 (stressing that "[t]he policy that § 1404(a) should not deprive parties of state-law advantages, although perhaps discernible in the legislative history, has its real foundation in Erie").

As for our situation, yes, plaintiffs filed a diversity complaint alleging scads of state-law claims. But as the parties recognize, the present appeal (to borrow from plaintiffs' brief) "devolves from a dispute surrounding the scope and application" of a *federal* statutory defense —— which makes this case unlike Van Dusen and Ferens. And we cannot say it any clearer than now-Justice Ginsburg did many years ago: "[n]othing" in Van Dusen compels one federal court to apply another's interpretation of *federal law* after a case's transfer. See Korean Air Lines, 829 F.2d at 1186. The same goes for Ferens, by the way. So plaintiffs' Van Dusen/Ferens-based arguments go nowhere.

Now, true, Congress sometimes tells a federal court to apply another's interpretation of federal law — like when "Congress . . . instruct[s] federal courts to adopt state law or federal law of individual circuits as of a given date," which implies that "some aspects of federal law will be 'geographically non-

uniform.'"  See 15 Charles Alan Wright et al., *Federal Practice and Procedure* § 3846 (4th ed. 2018).  And in that situation, "some courts conclude that the transferee court should apply the law that would have been applied by the transferor court's circuit."  Id.

Two cases plaintiffs cite to fall in that category: Eckstein, a Seventh Circuit opinion, and Olcott, a Tenth Circuit opinion.  See Eckstein, 8 F.3d at 1126 ("agree[ing] with Korean Air Lines that a transferee court" should typically consider federal questions "independently and reach[] its own decision, without regard to the geographic location of the events giving rise to the litigation," but concluding that § 27A of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa-1, "instructs us to act differently" on a statute-of-limitations issue); Olcott, 76 F.3d at 1545-46 (same, quoting Eckstein).[7]  Our situation, however, does not involve any congressional command compelling a transferee court to apply another Circuit's understanding of federal law.  So

---

[7] See generally McMasters v. United States, 260 F.3d 814, 819 (7th Cir. 2001) (emphasizing that "[o]nly where the law of the United States is specifically intended to be geographically non-uniform" — such as with § 27A — "should the transferee court apply the circuit precedent of the transferor court").  But see Menowitz, 991 F.2d at 40 (holding that because "federal law (unlike state law) is supposed to be unitary," a transferee court should use the law of its Circuit and not the law of the transferor court when dealing with a § 27A limitations issue).

despite plaintiffs' best efforts, they get no help from <u>Eckstein</u> and <u>Olcott</u>.

Plaintiffs' brief also hypes two district court opinions: <u>In re Fresenius Granuflo/NaturaLyte Dialysate Prods. Liab. Litig.</u>, 76 F. Supp. 3d 294 (D. Mass. 2015), and <u>In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.</u>, 241 F.R.D. 435 (S.D.N.Y. 2007). <u>Fresenius</u> did not involve a § 1404(a) transfer, however. The issue there was what *state* law should apply to plaintiffs' *state*-law consumer protection claim. <u>See</u> 76 F. Supp. 3d at 300-05. And nothing in <u>Fresenius</u> suggests the district court believed it had to apply the *federal* law of any Circuit other than the First Circuit. In <u>MTBE</u>, the judicial panel on multi-district litigation transferred plaintiffs' *state*-tort lawsuit to a single district court (the "MDL court") for consolidated pre-trial proceedings with other similar suits, knowing that once these proceedings concluded, each case not terminated would return to the original district court for trial. <u>See</u> 241 F.R.D. at 437-40; 28 U.S.C. § 1407. The MDL court held that "[i]n the context of pre-trial issues such as motions to dismiss . . . section 1407 requires the application of the law of the transferee circuit where the motions are being considered." <u>MTBE</u>, 241 F.R.D. at 439. But for "issues inherently enmeshed with the trial," the MDL court said that the law of the transferor courts should apply because the cases would have to go back to them for any trial. <u>Id.</u> at

440-41. That situation is nothing like the one before us. Plainly then, neither of these non-binding district court opinions helps plaintiffs' cause.[8]

The long and the short of it is that First Circuit caselaw interpreting BSA immunity applies here, not Eleventh Circuit caselaw. And we trudge on.

---

[8] As a parting shot on this issue, plaintiffs fume that Fidelity pulled a fast one, convincing the Florida federal court to transfer the case (as they put it) for "the conveniences of administering discovery and trial," but then moving to dismiss their claims after the transfer (they make this argument under the heading blasting the Massachusetts federal court's use of First Circuit law). To their way of thinking, principles of judicial estoppel precluded Fidelity from asking the transferee court to jettison their claims, thus eliminating the need for discovery and trial. But their argument does not hold together.

Judicial estoppel applies "when a litigant is playing fast and loose with the courts, and when intentional self-contradiction is being used as a means of obtaining unfair advantage" — with "[u]nfair advantage generally" meaning the "party . . . succeeded previously with a position directly inconsistent with the one it currently espouses." Franco v. Selective Ins. Co., 184 F.3d 4, 9 (1st Cir. 1999) (internal quotation marks omitted); see also Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004) (emphasizing that "[t]he doctrine's primary utility is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the justice system"). Nothing approaching that scenario happened here. Plaintiffs suggest that Fidelity kept the BSA-immunity theory under wraps for later use in the transferee court. Yet, on this record, that is pure speculation — really, it is worse than that, since the record (don't forget) shows Fidelity invoked BSA immunity in the very same motion in which it alternatively argued for a transfer. Plus plaintiffs cite no authority (nor can we think of any) embracing their view that a litigant in Fidelity's shoes cannot later move to dismiss a case after securing a § 1404(a) transfer.

*First Circuit Law Bars Plaintiffs' Claims*

Again, plaintiffs' basic theory is that Fidelity cannot get BSA immunity. And that is because, according to plaintiffs, Fidelity acted in "bad faith" by "intentionally" filing an SAR that accused them of manipulating the market to create a short squeeze — all the while knowing it was "objectively impossible" for them to have done so, since Fidelity knew its *own* misconduct had triggered the short squeeze. And plaintiffs make several arguments for why they are right and thus should get to bring their case to trial. But our Stoutt opinion — which involved a criminal referral form ("CRF"), a predecessor form to the SAR — pulls the rug out from under them.

The defendant bank in Stoutt filed a CRF with the FBI, accusing Palmer Stoutt of passing a check he knew he did not have cash to cover. 320 F.3d at 28. He alleged that the bank encouraged him to do what he did (for reasons not relevant here). Id. at 27-28, 32. The bank "cast" the CRF "as the disclosure of a possible case of bank fraud," unquestionably "a possible" federal offense. Id. at 30. And after the FBI investigated and arrested him, a federal grand jury indicted him for that crime. Id. at 28-29. But the government dismissed the charges (for reasons not revealed in the record). Id. at 29. Unwilling to let bygones be bygones, Stoutt (as relevant here) sued the bank in federal court, alleging only local-law torts. See id. As an affirmative defense, the

bank claimed immunity from all of Stoutt's local-law claims under the BSA's "safe harbor provision," which "protects disclosures of 'any possible violation of law.'" Id. at 29, 30.[9] And the district court later granted the bank's BSA-immunity-based motion for summary judgment. Id. at 29.

Zeroing in on the "any possible violation of law" phrasing, Stoutt argued on appeal that the provision implicitly requires that "any suspicions conveyed to the authorities be held in good faith" — a prerequisite missing there "because the Bank knew that [he] was innocent of criminal conduct." Id. But we would have none of it. "Conceivably," we wrote, "Stoutt could argue that the report was not one of a possible violation, even though so termed and colorably disclosing a possible crime, if the Bank knew that there was (in reality) no violation." Id. at 30. "But," we added, "this is a non-literal reading of the statute, which speaks of 'any possible violation.'" Id. And, we noted, "whatever its internal beliefs" — Stoutt, again, claimed the bank was dead certain that he was guiltless — "the Bank did by any objective test identify a 'possible violation.'" Id.

As support for our position, we drove home these points: Congress could have easily added a good-faith requirement to the

_____

[9] The version of the BSA that applied in Stoutt is slightly different from the one that applies now. See id. at 29 n.3. But the difference does not matter, because both grant civil immunity for a "disclosure of any possible violation of law."

- 23 -

statute but did not.  Id. at 31.  Actually, such a "requirement . . . was at one time in the proposed immunity provision" but got pulled before passage.  Id.  Which makes sense, since the provision was (according to its congressional author) "intended to provide 'the broadest possible exemption from civil liability for the reporting of suspicious transactions.'"  Id. (quoting 139 Cong. Rec. E57-02 (1993)).  And as far as Congress's policy concerns, "*any* qualification" on the immunity created by the BSA "poses practical problems," including that imposing an "objective reasonableness" or a "subjective good faith" requirement on a filing would "obviously create[] a risk of second guessing" and discourage disclosure.  Id. (emphasis added).  More, the risk that an "unfounded" or "malicious" filing will result in "false charges" is slight since "ordinarily the disclosures will as a practical matter be made to the [government] authorities, who provide their own filter as to what investigations are pursued and made public." Id. at 32.  More still, "remedies other than private damage actions are available for wilfully false reports:  private sanctions such as employment termination, and government penalties such as fines and imprisonment."[10]  Id. (citing 18 U.S.C. §§ 1001, 1517).

---

[10]  "Wilfully" is the British spelling of the American "willfully."  See Bryan A. Garner, *Garner's Modern American Usage* 864 (3d ed. 2009).

- 24 -

Given this compendium of considerations, we concluded that the BSA immunizes financial institutions even if their "disclosures [are] unfounded, incomplete, careless and even malicious," just so long as they identify "a possible violation" of law — something the bank had done there. See id. at 32 (internal quotation marks omitted). And in doing so, we rejected the Eleventh Circuit's view in Lopez, 129 F.3d at 1192-93 — the very opinion our plaintiffs urge us to follow — that immunity applies only when "a financial institution ha[s] a good faith suspicion that a law or regulation may have been violated." Instead, we accepted the Second Circuit's position in Lee v. Bankers Trust Company, 166 F.3d 540, 544 (2d Cir. 1999), that the "plain language of the safe harbor provision describes an unqualified privilege, never mentioning good faith or any suggestive analogue thereof." See Stoutt, 320 F.3d at 30 (siding with the Second Circuit over the Eleventh Circuit).

Now back to our case. Calling Fidelity's conduct "deceptive," "fraudulent," and "misleading" — words they use because Fidelity submitted the SAR to conceal its *own* crime — plaintiffs' brief argues at length that financial institutions cannot get BSA immunity if they acted in "bad faith." Which is simply another way of saying financial institutions can get BSA immunity only if they acted in "good faith." But that argument goes poof, given how it is just like the one we shot down in

- 25 -

Stoutt.  See 320 F.3d at 30-32.

Ditto for plaintiffs' contention that BSA immunity does not apply if the SAR accuses someone of an "objectively impossible" violation of law — "objectively impossible," the argument goes, because Fidelity caused the illegal short squeeze, not them.  But, to repeat, Stoutt expressly refused to limit BSA immunity by splicing an "objective reasonableness" requirement into the statute.  See id. at 31.  Anyway, if an SAR discloses an "objectively impossible" violation of law — plaintiffs offer the hypothetical example of an SAR accusing the Deutsch family of "kill[ing] Abraham Lincoln in 2012" — we doubt the government would investigate or prosecute such an accusation.  Stoutt also said with crystalline clarity that this immunity applies even if a financial institution files an SAR that is "wholly unfounded." Id.  And we think that phrase is broad enough to encompass a situation where the SAR claims an "impossible" or "objectively impossible" violation of law.

Stoutt similarly precludes plaintiffs' argument "that an intentionally misleading SAR" prevents Fidelity from getting BSA immunity.  After all, Stoutt firmly ruled that a financial institution receives BSA immunity for SAR disclosures even for "malicious" or "wilfully false" disclosures. Id. at 31-33.

And plaintiffs' argument about congressional policy is hardly a difference-maker either.  That is so because Stoutt

- 26 -

factored Congress's policy concerns into its decisional mix and reached a result that cuts against the very one plaintiffs push for here.

Having said all this, however, we think it equally important to reemphasize something Stoutt emphasized. Which is that even though private actions are off the table, financial institutions that file malicious or intentionally false SARs are hardly untouchable. Among other things, and as Stoutt was at pains to explain, the federal government can go after them, with fines and prison time where appropriate. Id. at 32.

Undaunted by Stoutt, plaintiffs still believe they hold a winning hand, thanks to three state-court opinions that withheld BSA immunity from an SAR filer that twisted the truth in its report, just like Fidelity did by not disclosing that *it* — and not the Deutsches — had illegally manipulated the market. The three cases are Bank of Eureka Springs v. Evans, 109 S.W.3d 672 (Ark. 2003), Digby v. Tex. Bank, 943 S.W.2d 914 (Tex. App. 1997), and Walls v. First State Bank of Miami, 900 S.W.2d 117 (Tex. App. 1995). The difficulty for plaintiffs is that a prior panel opinion like Stoutt remains binding on us until (a) the Supreme Court or the First Circuit sitting *en banc* judicially overrules it; (b) Congress statutorily overrules it; or, in exceedingly infrequent situations, (c) non-binding but compelling caselaw convinces us to abandon it. See, e.g., United States v. Walker-

Couvertier, 860 F.3d 1, 8 (1st Cir. 2017), cert. denied sub nom. Lugo-Diaz v. United States, 138 S. Ct. 1303 (2018), and cert. denied, 138 S. Ct. 1339 (2018). Exceptions (a) and (b) do not apply here. As for exception (c), Digby and Walls predate Stoutt and so lacked the benefit of Stoutt's reasoning. And Evans misread Stoutt as requiring an objective basis for an SAR filing, see 109 S.W.3d at 680, when Stoutt rejected such a requirement, see 320 F.3d at 31-32. Evans also provoked a spirited dissent, which scolded the majority for "substitut[ing]" its "interpretation of a federal statute for that announced by the *great majority* of federal courts interpreting that same statute." See 109 S.W.3d at 686-87 (Thornton, J., dissenting) (emphasis added). All of which is to say that we must — and do — follow Stoutt.[11]

### Final Words

Having worked our way through the issues, we **affirm** the judgment entered below.[12] Each party shall bear its own costs on

---

[11] As a last gasp, plaintiffs suggest that because Stoutt decided the BSA-immunity issue on summary judgment after discovery, our judge acted "unprecedented[ly]" by kicking out their claims on a motion to dismiss. The easy answer to this contention is that the Second Circuit in Lee resolved a BSA-immunity issue in the context of a motion to dismiss. See 166 F.3d at 543. And we embraced Lee in Stoutt. See 320 F.3d at 30. Which means plaintiffs' suggestion does not change the outcome of this case.

[12] One last matter. Fidelity also argues that we can affirm on an alternative ground — namely, that federal law bars it "from disclosing even whether a[n] SAR was filed, let alone its contents"; so "[p]laintiffs can never prove that [it] filed an inaccurate SAR"; and thus it "cannot be forced to defend against

appeal.

---

[their] claims while, at the same time, being prohibited from using key exculpatory evidence."  But given our holding, we do not address that argument.