# United States Court of Appeals
## For the First Circuit

No. 20-1378

MAISHA EMMANUEL,

Plaintiff, Appellant,

v.

HANDY TECHNOLOGIES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Shannon E. Liss-Riordan, with whom Matthew Thomson, Michelle
Cassorla, and Lichten & Liss-Riordan, P.C. were on brief, for
appellant.
Michael Mankes, with whom Jennifer M. Duke and Littler
Mendelson P.C. were on brief, for appellee.

March 22, 2021

**BARRON**, **Circuit Judge**.  This appeal concerns Maisha Emmanuel's 2015 putative class action in the District of Massachusetts against Handy Technologies, Inc. ("Handy"), which is the operator of an online platform that enables users to retain the services of house cleaners and other providers of at-home services.  The suit claims that Emmanuel and others in the putative class qualified as employees of Handy under both the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219, and Mass. Gen. Laws ch. 149, § 148B.  The suit further claims, among other things, that, in consequence, Handy failed to pay them the minimum wage to which they were entitled under those measures for the work that they were retained to provide through Handy's online platform.

Handy moved to dismiss the suit and to compel individual arbitration pursuant to Federal Rule of Civil Procedure 12(b)(1) and 9 U.S.C. §§ 3, 4.  Handy premised the motion on certain provisions that were set forth in an online contract ("the Agreement") that it claimed to have entered into with Emmanuel. The District Court granted that motion, and Emmanuel now appeals. We affirm.

## I.

Emmanuel had worked as a nanny and house cleaner for a number of years before, in May 2015, she learned about Handy through indeed.com, a job posting website.  She thereafter accessed

- 2 -

Handy's website and completed a form on it titled, "Home Cleaner Application."

To complete the online application form, Emmanuel was required to provide personal information; describe her availability and past work experience; recount how she learned about Handy; indicate whether she had access to a smartphone, the Internet, a car, and a bank account; and attest to her ability to work legally in the United States. Once the online form had been completed, the Handy website required Emmanuel to click a checkbox next to the words "I agree to Handy's Terms of Use" before she could proceed to the next page. That page then contained a box labeled "Submit Application."

The words "Terms of Use" were in blue font and were a hyperlink to a page with text appearing under those same words. The text set forth various terms, including a mandatory arbitration clause that was visible if one scrolled through the text on the screen.

Shortly after Emmanuel submitted the completed online application form through the Handy website, a Handy representative contacted her regarding an interview, which was conducted over the phone. She then attended an orientation session for Handy that was held in Boston, Massachusetts. At some point thereafter, she was also required by Handy as part of the application process to complete a background check.

Handy then provided Emmanuel with a personal identification number ("PIN") to access its app, which would enable her to connect with Handy customers who were seeking to retain house cleaners through the company's online platform. On May 14, 2015, Emmanuel used her smartphone to access that app with that PIN.

Upon opening the app, Emmanuel encountered a screen that she was required to review prior to proceeding to access further information on the app. The screen contained the following text:[1]

> To continue, please confirm that you understand the following:
>
> - I understand and acknowledge that I am a self-employed contractor and not a Handy employee.
>
> - I specifically desire and intend to operate as an independent contractor.
>
> - I understand that I am responsible for all costs and expenses associated with operating as an independent contractor, including with respect to tools, insurance, materials, supplies and personnel.
>
> - I understand and agree that, if at any time, I believe that my relationship with Handy is something other than an independent contractor, I agree to immediately notify Handy of this view.
>
> - I understand that the Handy Service Professional Agreement has changed and that I need to carefully read the updated agreement on the following screen before agreeing to the new terms.

---

[1] It is not clear from the record how much of the text was visible to Emmanuel, given the specifics of her smartphone, without scrolling, but she makes no argument that this uncertainty bears on the issues before us.

To proceed beyond that screen, Emmanuel was required to click a blue button that read "Confirm" and that was placed below the bullet points. The only other button that she could have selected was a gray button reading "Click here to return to portal home and see the newest jobs."

Selecting the latter button would have refreshed the screen and displayed the bullet points again. Emmanuel selected "Confirm."

Emmanuel was then presented with a second screen. The top of that screen read: "To continue, please accept the revised Independent Contractor Agreement." Those words were followed by the title "HANDY TECHNOLOGIES, INC. SERVICE PROFESSIONAL AGREEMENT" and the initial sentences of the Agreement, which began:

> This Service Professional Agreement . . . sets forth the terms and conditions whereby you, an independent service provider fully-licensed (to the extent required by applicable law) and qualified to provide the services contemplated by this Agreement . . ., agree to provide certain services (as described on Schedule 1) to third parties that may, from time to time, be referred to you via the web-based platform of Handy Technologies, Inc. . . . . BY USING THE HANDY PLATFORM (AS DEFINED BELOW), YOU ARE AGREEING TO BE BOUND BY THE TERMS OF THIS SERVICE PROFESSIONAL AGREEMENT. IF YOU DO NOT AGREE TO THE TERMS OF THIS SERVICE PROFESSIONAL AGREEMENT, DO . . . .

The visible text on this screen ended mid-sentence, after the word "DO," and a fraction of the text in the following

- 5 -

line was visible prior to scrolling.[2]  There was no scroll bar in the interface but a user could read the Agreement in its entirety by scrolling with the aid of the touch screen.

Regardless of whether a user scrolled through the terms of the Agreement, a blue button labeled "Accept" was located at the bottom of the screen, partially obscuring the Agreement's text. The alternative to selecting "Accept" once more was to click a gray button, which again was labeled "Click here to return to portal home and see the newest jobs."  Doing so would simply result in the same screen being refreshed.

Emmanuel testified that she did not scroll through the terms of the Agreement on the day that she downloaded the app. Had she done so, she would have found, at section twelve out of fifteen, a provision entitled "DISPUTE RESOLUTION; GOVERNING LAW."

The second paragraph of that section provided as follows:

> Mandatory and Exclusive Arbitration.  Handy and Service Professional mutually agree to resolve any disputes between them exclusively through final and binding arbitration instead of filing a lawsuit in court.  This arbitration agreement is governed by the Federal Arbitration Act . . . and shall apply, including but not limited to, to any and all claims arising out of or relating to this Agreement, the Service Professional's classification as an independent contractor, Service Professional's

---

[2] Here, too, the record is not clear as to whether the text on Emmanuel's phone screen displayed differently than the screenshots that are in the record, but she has not argued that her display differed in any meaningful way.

provision of Services under this Agreement, the payments received by Service Professional for providing Services, the termination of this Agreement, and all other aspects of the Service Professional's relationship with Handy, past or present, whether arising under federal, state or local statutory and/or common law.[3]

Instead of reviewing that language, Emmanuel pressed the button on the screen labeled "Accept." Doing so enabled her to use the app to sign up to perform jobs solicited by residential customers of Handy. Emmanuel performed between ten and twenty jobs for Handy customers in May 2015 using the app.

At the end of that month, however, Emmanuel stopped taking jobs through Handy. Per her later explanation, she decided to do so because she "had an issue with non-payment of a couple of jobs that [she] completed."

Nonetheless, in early June 2015, Emmanuel did log in to the Handy app one more time. She did so to obtain personal information in order to "keep records of [the] ongoing situation of . . . not being paid for the jobs that [she had] done with Handy."

Before Emmanuel could review that information when she logged in to the app on that occasion, she was presented with a

---

[3] The text of this provision is similar but not identical to the provision concerning arbitration that we have referred to earlier and that was set forth under the heading "Terms of Use" on the Handy website. Emmanuel makes no argument that any of the differences between the two provisions is material to any issue before us.

screen that indicated that the terms of the Agreement had changed. She was once again required to click "Accept" on a screen displaying the initial terms of the Agreement before proceeding to retrieve her records. She did so. That iteration of the Agreement likewise contained a mandatory arbitration provision.

On July 7, 2015, Emmanuel filed a complaint in the U.S. District Court for the District of Massachusetts. She brought suit "on behalf of individuals who have worked for Handy . . . as cleaners anywhere in the United States (other than California)."

Emmanuel alleged that Handy had misclassified the putative class members as independent contractors rather than employees and had therefore violated the FLSA, see 29 U.S.C. § 206, and Mass. Gen. Laws ch. 151, § 1, by failing to pay them the minimum wage required by each statute. She also contended that Handy had violated Mass. Gen. Laws ch. 149, § 148, by requiring the putative class members to bear the costs of their own cleaning supplies.

Handy moved to dismiss and compel arbitration on August 10, 2015 pursuant to Federal Rule of Civil Procedure 12(b)(1) and 9 U.S.C. §§ 3, 4. The company argued that Massachusetts law applied and that, under it, Emmanuel was bound by the Agreement, which Handy contended requires arbitration of the claims at issue and bars her from bringing a class or collective action. Handy asserted that Emmanuel had entered into the Agreement with the

company in three different instances -- when she completed the original online application, when she downloaded the mobile app, and when she logged in to the website to obtain her personal records.[4]

Emmanuel opposed the motion on a number of grounds. Among them were that, under Massachusetts law, she had not entered into the Agreement and that, even if she had, the Agreement could not be enforced to compel arbitration due to the doctrine of unconscionability.

The District Court held a one-day bench trial on February 10, 2020. The District Court first found that, although Emmanuel did not originally recall doing so, she had clicked the checkbox next to the words "I agree to Handy's Terms of Use" when completing the application in early May 2015; that she had clicked "Accept" when presented with the Agreement on May 14, 2015, when she first downloaded the app; and that she had again clicked "Accept" with respect to the Agreement on June 5, 2015, when she reopened the app to retrieve her personal information. The District Court then held that, under Massachusetts law, Emmanuel had, in each of those

---

[4] Although several versions of the Agreement were in place during the times relevant to this case, Emmanuel has not asserted that the versions differed in any material way. We will therefore refer to "the Agreement" without differentiating between them.

three instances, entered into an agreement to arbitrate with Handy, and to waive her right to bring a class claim.[5]

The District Court also rejected Emmanuel's argument that, even if she had entered into the agreement with Handy to arbitrate and to waive her class claim, the agreement was not enforceable under the unconscionability doctrine. The District Court explained that First Circuit precedent precluded her claim that the arbitration clause itself was unconscionable, see Bekele v. Lyft, Inc., 918 F.3d 181, 187-89 (1st Cir. 2019), and that the only other provision in the Agreement that she contended was unconscionable was severable and thus did not provide a basis for voiding the agreement to arbitrate itself. The District Court therefore granted Handy's motion to compel arbitration and dismissed Emmanuel's putative class action claim. Because the District Court also concluded that the separate class action waiver in the Agreement was likewise enforceable, it directed Emmanuel to "submit her individual claims to arbitration."

Emmanuel filed a timely notice of appeal on March 30, 2020. See Fed. R. App. P. 4(a)(1)(A); Fed. R. App. P. 26(a)(1)(C). In the notice of appeal, Emmanuel challenges the District Court's granting of the motion to compel arbitration as well as its order

---

[5] The District Court explained that it applied Massachusetts law "despite the contemplation of New York law" in the various alleged contracts because both Emmanuel and Handy "appear[ed] to agree" that was the proper course.

of dismissal. Her briefing to us addresses only the District Court's enforcement of the arbitration provision and does not challenge any aspect of the District Court's order with respect to the class action waiver. We thus focus solely on the challenge to the District Court's ruling regarding the arbitration provision.

We have jurisdiction under 28 U.S.C. § 1291. We review a district court's order granting a motion to dismiss and to compel arbitration de novo. Waithaka v. Amazon.com, Inc., 966 F.3d 10, 16 (1st Cir. 2020).

## II.

Emmanuel first contends that the District Court erred in ruling that, under Massachusetts law, she had entered into an agreement to arbitrate. She argues that the contract formation issues in this case are for the court to decide rather than for the arbitrator and that they turn on the requirements of Massachusetts contract law. See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Moreover, we decline to consider Handy's argument to the contrary, because Handy failed to raise that argument below. See In re Curran, 855 F.3d 19, 27 n.4 (1st Cir. 2017).

After the parties submitted their briefing to us on appeal addressing contract formation, the Massachusetts Supreme Judicial Court ("the SJC") decided Kauders v. Uber Technologies, Inc., 159 N.E.3d 1033 (Mass. 2021). There, the SJC set forth the

"proper framework for analyzing issues of online contract formation" under Massachusetts law. Id. at 1049.

In light of that development, we ordered supplemental briefing from the parties about the import to this case of the SJC's decision in Kauders. See, e.g., Steinmetz v. Coyle & Caron, Inc., 862 F.3d 128, 133 (1st Cir. 2017). Having now reviewed the supplemental briefs as well as Kauders itself, we conclude that Kauders compels us to find that Emmanuel did form an arbitration agreement with Handy and that, in consequence, there is no need for us to certify the issue of contract formation to the SJC. See Easthampton Sav. Bank v. City of Springfield, 736 F.3d 46, 51 (1st Cir. 2013) (providing that certification is not appropriate "in cases when 'the course the state court would take is reasonably clear'" (alterations omitted) (quoting In re Engage, Inc., 544 F.3d 50, 53 (1st Cir. 2008))).[6]

**A.**

Kauders explained that for an online contract to have been formed under Massachusetts law the user of the online interface must have been given "reasonable notice of the terms" of the agreement and must have made a "reasonable manifestation of

---

[6] Emmanuel separately argued in her original briefs to this Court that the arbitration provision itself was not "reasonably conspicuous" within the Agreement, but, in light of Kauders, which does "not require that the [reasonable] notice be 'conspicuous,'" 159 N.E.3d at 1049 n.25, Emmanuel's argument fails.

assent to those terms." 159 N.E.3d at 1049. Kauders further explained that the party seeking to enforce the contract bears the burden of establishing that each of these requirements has been met. Id.

The "reasonable notice" requirement is plainly satisfied, according to Kauders, when a party to the online contract has "actual notice" of its terms, such as would be the case if that party had "reviewed" those terms or "must somehow interact with the terms before agreeing to them." Id. But, the SJC further explained in Kauders that, even absent actual notice, the reasonable notice requirement may be met if "the totality of the circumstances" indicate that the user of the online interface was provided with such notice of the terms. Id.

Kauders describes the relevant factors to consider in assessing whether such reasonable notice was provided in the absence of actual notice. It explains that these factors include the "form of the contract" -- such as whether the "document containing or presenting terms . . . appear[s] to be [a] contract." Id. (citing Polonsky v. Union Fed. Sav. & Loan Ass'n, 138 N.E.2d 115, 117-18 (Mass. 1956)).

Kauders noted that "contracting over [the] Internet is different from paper transactions" and that "reasonable users of [the] Internet may not understand that they are entering into a contractual relationship." Id. (citing Sgouros v. TransUnion

Corp., 817 F.3d 1029, 1035 (7th Cir. 2016)). And, in accord with that observation, Kauders explained that notice is more likely reasonable where "the nature, including the size, of the transaction" suggests a contract is being entered into, where "the notice conveys the full scope of the terms and conditions," and where the "interface . . . 'adequately communicate[s]' . . . the terms . . . of the agreement." Id. at 1049-50 (quoting Sgouros, 817 F.3d at 1034). "Ultimately," the SJC explained, the question of reasonable notice comes down to whether "the offeror [has] reasonably notif[ied] the user that there are terms to which the user will be bound and [has] give[n] the user the opportunity to review those terms." Id. at 1050.

Finally, Kauders addressed what is required to find that a party has manifested assent to the terms of an online agreement. Id. at 1050-51. The SJC first explained that so-called "clickwrap" agreements -- where a user is "required to expressly and affirmatively manifest assent to an online agreement by clicking or checking a box that states that the user agrees to the terms and conditions" -- are "regularly enforced" and are the "clearest manifestations of assent." Id. at 1050. Alternatively, the SJC explained, in the absence of "such express agreement," the task is "more difficult" and "courts must again carefully consider the totality of the circumstances," including whether "the connection

- 14 -

between the action taken and the terms is []clear" and whether "the action taken . . . clearly signif[ies] assent." Id. at 1051.[7]

**B.**

The parties address the import under Kauders of Emmanuel's having checked the box on the application on Handy's website that asked if she "agree[d]" to the "Terms of Use." We focus our analysis instead on a different action that she took but that the parties also address in relation to Kauders: her subsequent selection of "Accept" on the screen containing the initial sentences of the Agreement on the Handy app on May 14, 2015. As we will explain, we conclude that, per Kauders, Emmanuel had reasonable notice of the mandatory arbitration provision in the Agreement that Handy seeks to enforce when she selected "Accept" on that app at that time, such that -- setting aside for the moment her separate contention regarding the doctrine of unconscionability -- she was bound by it.

The "form" of the Agreement, Kauders, 159 N.E.3d at 1049, clearly points in favor of the conclusion that Emmanuel had reasonable notice that it contained terms to which she would be bound when she selected "Accept" on the app on May 14, 2015. The language that the Handy app displayed on the screen of Emmanuel's smartphone prior to her selecting "Accept" at that time stated:

_____

[7] This appeal does not implicate the assent issue Kauders addresses.

- 15 -

"To continue, please accept the revised Independent Contractor Agreement." In addition, that screen displayed text that was plainly a portion of the "Agreement" that she was being asked to "[a]ccept."

True, only a portion of the Agreement was automatically visible prior to her selecting "Accept," and the term at issue here concerning arbitration did not immediately appear on the screen containing the "Accept" button. It would have been visible only by scrolling, and the app did not require Emmanuel to scroll through the Agreement in its entirety prior to proceeding to the next screen.

Nonetheless, the screen displaying the portion of the Agreement that was plainly visible before Emmanuel selected "Accept" made clear that additional text further specifying the terms of the Agreement could be viewed by scrolling. For example, the visible text explicitly referred to later portions of the Agreement that could not yet be seen, and the final visible sentence was prematurely truncated in a manner that suggested that additional text continued below what was revealed initially. Indeed, we note that Emmanuel herself acknowledged in her deposition that she in fact did scroll through the full Agreement at a later date.

To the extent that Emmanuel means to argue that, as a matter of law, she did not receive reasonable notice of the term

of the Agreement that is at issue because the app did not require her to scroll through its terms prior to selecting "Accept," that contention is unpersuasive. Kauders did note, in finding no online contract to have been formed in that case, that the online interface at issue there "did not require the user to scroll through the conditions or even select them," 159 N.E.3d at 1052 (emphasis added), and that it "allow[ed] the registration to be completed without reviewing or even acknowledging the terms and conditions," id. at 1054 (emphasis added). But, we do not read either statement impliedly to suggest that a user must be required to scroll through the full text of an agreement prior to manifesting assent to it in order to be bound by terms visible only through scrolling. Otherwise, the references to "select[ing]" or "acknowledging" the terms in those statements by the SJC would be unnecessary. Nor does Emmanuel identify any precedent beyond those statements that would indicate that Massachusetts law imposes such a requirement, and we are not aware of any. Cf. Meyer v. Uber Techs., Inc., 868 F.3d 66, 77-79 (2d Cir. 2017) (applying California law and upholding an arbitration provision in an online contract without finding that the interface required the user to scroll through terms); RealPage, Inc. v. EPS, Inc., 560 F. Supp. 2d 539, 545 (E.D. Tex. 2007) (applying Texas law); Kilgallen v. Network Sols., Inc., 99 F. Supp. 2d 125, 129-30 (D. Mass. 2000) (applying Virginia law); cf. also Penniman v.

- 17 -

Hartshorn, 13 Mass. 87, 90-91 (1816) (upholding contract even though location of signature might suggest party seeking to evade enforcement did not read entire document); Mahoney v. RBS Citizens, N.A., 919 N.E.2d 717, 2010 WL 129808, at *2 n.5 (Mass. App. Ct. 2010) (unpublished table decision) ("There is . . . no requirement that every page of a contract be signed for it to be enforceable against the signatory.").

Emmanuel also cannot succeed in arguing that she was not provided with "reasonable notice" of the arbitration provision because she chose not to review it despite having had an adequate opportunity to do so. Kauders makes clear that a party may be "bound by [the] terms of [a] contract regardless of whether [the] party actually read [the] terms." 159 N.E.3d at 1049 (citing Miller v. Cotter, 863 N.E.2d 537, 545 (Mass. 2007)).

Insofar as Emmanuel contends that, per Kauders, she did not receive reasonable notice of the mandatory arbitration provision due to the "nature" or the "size" of the online "transaction" at issue, id. at 1049-50, we also cannot agree. The context of the "transaction" here is very different from the one in Kauders, which concerned whether a passenger using a ride-sharing service was bound by an online agreement. Id. at 1038-39.

There, in finding no agreement to have been formed, the SJC held that a user who is "signing up via an app for ride

- 18 -

services," id. at 1051, might "reasonably believe he or she is simply signing up for a service without understanding that he or she is entering into a significant contractual relationship," id. at 1054. But, Emmanuel did not simply download the app and open it. She did so only after going through various screening processes conducted by Handy, including completing an online application, participating in a telephone interview, undergoing a background check, and attending an in-person training session.

Moreover, Emmanuel was able to download the Handy app that set forth the Agreement only after receiving a PIN that Handy provided to her after she completed those steps in the process of applying to find jobs through the company. And, unlike the situation in Kauders, where the online interface made it possible for a user to sign up without seeing any terms at all and where the app's design made it easy to overlook the fact that creating an account would simultaneously bind the user to a contract, id. at 1051-54, Emmanuel was explicitly required to "[a]ccept" an agreement displayed in the app that informed her in its first sentence that it contained terms that governed the services she provided through Handy.

Thus, we conclude that, under Kauders, Emmanuel did have reasonable notice of the term in the Agreement concerning arbitration that is at issue on appeal. Accordingly, we reject her argument that the District Court erred in granting Handy's

motion to dismiss and compel arbitration, because we conclude that, contrary to her contention otherwise, she did enter into a contract with Handy in which she agreed to arbitrate the state and federal claims that she now brings.

## III.

Emmanuel also contends that the District Court erred in dismissing her suit because the term in the Agreement concerning arbitration cannot be enforced due to the doctrine of unconscionability. Emmanuel premises her argument on the doctrine of unconscionability under Massachusetts law.

As a general matter, Massachusetts law requires a party invoking that doctrine to establish "both substantive unconscionability (that the terms are oppressive to one party) and procedural unconscionability (that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise)." Machado v. System4 LLC, 28 N.E.3d 401, 414 (Mass. 2015) (quoting Storie v. Household Int'l, Inc., No. 03-40268-FDS, 2005 WL 3728718, at *9 (D. Mass. Sept. 22, 2005)). Thus, Emmanuel must identify the specific term or terms in the Agreement that are substantively unconscionable.

The only term in the Agreement that Emmanuel identifies as being substantively unconscionable is the "unilateral

- 20 -

modification clause" in the Agreement.[8]  That term purports to permit Handy to modify the terms of the Agreement without notifying Emmanuel or requiring her to accept the changes.

But, "as a matter of substantive federal arbitration law," unless the party seeking to invalidate the arbitration agreement brings a "challenge . . . to the arbitration provision itself, the issue of the contract's validity is considered by the arbitrator in the first instance." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46 (2006).  "Another way to frame this analysis is to say . . . that 'an arbitration provision is severable from the remainder of the contract.'" Farnsworth v. Towboat Nantucket Sound, Inc., 790 F.3d 90, 97 (1st Cir. 2015) (quoting Buckeye Check Cashing, 546 U.S. at 445).

Thus, because the "basis" of Emmanuel's unconscionability challenge is not "directed specifically to the agreement to arbitrate," Rent-a-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 71 (2010), we may not address it.  After all, Emmanuel does not argue that the arbitration provision in the Agreement has

_____

[8] Emmanuel argued before the District Court that the Agreement's requirement that workers pay significant fees to arbitrate their claims was substantively unconscionable.  The District Court rejected that argument in reliance on Bekele, 918 F.3d at 188-89, because here Handy has agreed to pay all of Emmanuel's arbitration fees (as Lyft did there).  As Emmanuel's only contention in her opening brief is that the Bekele panel erred, we do not address this argument. See AER Advisors, Inc. v. Fidelity Brokerage Servs., LLC, 921 F.3d 282, 293 (1st Cir. 2019).

- 21 -

been revised in a meaningful way since she entered into the Agreement on May 14, 2015, such that the modification clause is implicated in the dispute over whether her claim should be subject to arbitration. Nor does she contend that the unconscionability of the modification clause so infects the Agreement that severing that clause would effectively rewrite the bargained-for exchange as to arbitration. See Booker v. Robert Half Int'l, Inc., 413 F.3d 77, 84-85 (D.C. Cir. 2005).

Accordingly, because Emmanuel's unconscionability contention is not a "challenge[] to the validity of the specific agreement to resolve the dispute through arbitration" but instead is a "challenge[] to the validity of an entire contract which contains an arbitration clause," Farnsworth, 790 F.3d at 96, it must be "considered by the arbitrator in the first instance," id. at 97 (quoting Buckeye Check Cashing, 546 U.S. at 445-46).[9] For this reason, her unconscionability-based challenge to the ruling below fails.

---

[9] Handy does also contend that the Agreement contains a delegation clause and thus that the severability issue itself is for the arbitrator. But, as Handy raises this issue for the first time on appeal, we do not consider it. See In re Curran, 855 F.3d at 27 n.4.

- 22 -

## IV.

For the reasons set forth above, we **affirm** the District Court's order compelling arbitration and dismissing Emmanuel's putative class complaint.